IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

STATESBORO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 623-017 |
| | ) | |
| JERMAINE MAURICE BROWN | ) | |

---

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

The Indictment charges Defendant with drug distribution and firearm possession. Defendant seeks to suppress fruits of an April 2021 vehicle search and a March 2022 home and vehicle search. After careful consideration of all briefing and the evidentiary hearing, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress fruits of the 2021 vehicle search be **GRANTED**, (doc. no. 229), and Defendant's motion to suppress fruits of the 2022 home and vehicle search be **DENIED**, (doc. no. 227).

## I.    FACTUAL BACKGROUND

### A.    April 2021 Traffic Stop and Vehicle Search

#### 1.    Facts Gleaned from Camera Footage and Officer Reports

On April 30, 2021, Officers Kelsey Guerra and Matthew Bell of the Vidalia Police Department stopped Defendant because he was driving without a seatbelt. (Doc. no. 229, p. 1; doc. no. 265, p. 1; doc. no. 229-1, "Incident Report," pp. 22, 25.) The officers observed Defendant moving around inside the Chevrolet Impala before it came to a stop, and all four windows were down. (Incident Report, pp. 22, 25.) Before Defendant came to a complete

stop, another patrol car driven by Treutlen County Deputy Sheriff Danny Williamson, a K-9 handler, arrived.  (Id. at 25.)

Officer Guerra approached the driver's side and explained to Defendant they pulled him over for a seatbelt infraction while Officer Bell stood on the passenger side.  (Id. at 22, 25.)  Officer Guerra instructed Defendant to step out of the Impala, and Defendant complied after posing a few questions.  (Id.)  Defendant walked behind the Impala and provided Officer Guerra his driver's license, as Officer Guerra instructed.  (Id.)  Officer Guerra returned to her patrol car to run Defendant's license and vehicle information while Officer Bell remained with Defendant and asked Deputy Williamson to perform a K-9 free air sniff, to which Defendant objected.  (Id.; see also doc. no. 315, Ex. 3, "Dash Cam," 05:15-06:00.)[1]

Deputy Williamson retrieved K-9 Freddy from his patrol car and leashed him.  (Doc. no. 315, Ex. 1, "Williamson BWC," 03:53-04:21.)  After circling the patrol cars and heading toward the Impala, Freddy began pulling Deputy Williamson toward the Impala, and Deputy Williamson gave the search command "find it."  (Id. at 04:53-04:57; Dash Cam at 06:16-06:18.)  Freddy sniffed the front grill and walked toward the driver's door but then looked and walked away from the Impala, (Williamson BWC at 04:57-05:02; Dash Cam at 06:17-06:24).  Deputy Williamson repeated "find it" and pulled Freddy's leash to redirect his attention.  (Williamson BWC at 05:01-05:02; Dash Cam at 06:24-06:26.)  Freddy briefly returned to the front of the Impala only to walk away again.  (Williamson BWC at 05:02-05:03; Dash Cam at 06:26-06:28.)  Deputy Williamson repeated "find it" and said "here . . . Freddy, up," while

---

[1] Government's Exhibit 3 and Defendant's Exhibit 1 is the same dash camera footage from Officer Guerra's patrol car depicting the Impala.  (Doc. no. 316, Ex. 1.)  Government's Exhibit 1 and Clip 1 of Defendant's Exhibit 2 is the same footage from Deputy Williamson's body camera.  (Doc. no. 316, Ex. 2.)

reaching inside the open driver's side window nearly up to his elbow.  (Williamson BWC at 05:03-05:05; Dash Cam at 06:27-06:28.)  Freddy responded by putting his front paws on the driver's door and his snout and face inside the window.  (Williamson BWC at 05:05-05:07; Dash Cam at 06:28-06:29.)  Freddy quickly retreated by pulling his face out of the window, placing his front paws back on the ground, and walking away.  (Williamson BWC at 05:07-05:10; Dash Cam at 06:29-06:32.)

As Freddy continued walking away from the Impala, Deputy Williamson pulled his leash back toward it.  (Williamson BWC at 05:09-05:11; Dash Cam at 06:30-06:32.)  Freddy circled around Deputy Williamson and walked away from the Impala.  (Williamson BWC at 05:11-05:14; Dash Cam at 06:32-06:36.)  Deputy Williamson said, "here, Freddy, here, here, find it," pulled the leash to redirect Freddy to the Impala, and tapped the Impala with the back of his hand near the seam where the trunk door meets the rear bumper.  (Williamson BWC at 05:14-05:18; Dash Cam at 06:36-06:40.)  Freddy briefly looked and walked toward the trunk, then walked away in the direction of people standing nearby.  (Dash Cam at 06:39-06:41; see also Transcript, pp. 19, 23 (explaining Freddy was distracted by nearby onlookers).)  Deputy Williamson pulled Freddy's leash toward the Impala, said "here, leave it, find it," continued tapping the trunk, and said, "Freddy, find it," while Freddy continued to look and walk away from the Impala.  (Williamson BWC at 05:19-05:24; Dash Cam at 06:41-06:47.)

Deputy Williamson pulled Freddy's leash toward the trunk, Freddy quickly sniffed the seam of the trunk and passenger side taillight, and Deputy Williamson walked him to the rear passenger window, which was approximately three-quarters open.  (Williamson BWC at 05:24-05:27; Dash Cam at 06:47-06:50.)  Deputy Williams said "here, up," gestured towards the window, said "Freddy, up, up," and put his hand inside the window.  Freddy paced back

and forth along the passenger side, and Deputy Williamson repeatedly pulled Freddy's leash to redirect his attention to the Impala. (Williamson BWC at 05:27-05:33; Dash Cam at 06:50-06:56.) When Deputy Williamson again said "up" and tapped the window with his hand, Freddy put his front paws on the rear passenger door. (Williamson BWC at 05:33-05:34; Dash Cam at 06:56-06:58.) Freddy briefly put his snout inside the window, looked away from the vehicle toward the onlookers, turned his head back toward the vehicle, and looked away again toward the onlookers. (Williamson BWC at 05:34-05:39; Dash Cam at 06:58-07:03.) Deputy Williamson again said "find it" and tapped the window, but Freddy retreated by putting his paws back on the ground and looking away from the Impala in the direction of the onlookers. (Williamson BWC at 05:39-05:45; Dash Cam at 07:03-07:09.)

Defendant pointed and yelled something inaudible, ostensibly protesting the continuing free air sniff, (Williamson BWC at 05:39-05:45; Dash Cam at 06:57-07:09), to which Deputy Williamson responded, "I'm tryin' to get the dog to sniff the odor of your car," (Williamson BWC at 05:42-05:45; Dash Cam at 07:05-07:08.) Defendant replied with an inaudible statement, and Deputy Williamson responded, "No, I'm not, okay? Everything's on video, what I do is by law, okay?" (Williamson BWC at 05:47-05:52.) Defendant again replied, and Deputy Williamson shouted back, "I can run him around this car a hundred times if I need to!"[2] (Id. at 05:52-05:57.) Throughout this interaction, Freddy was turned away from the Impala and looking elsewhere. (Dash Cam at 07:05-07:19.)

Deputy Williamson pulled Freddy's leash as Freddy again tried to walk away from the Impala and said, "here, up, Freddy, up" while tapping the rear passenger window. (Williamson

---

[2] A free air sniff cannot extend a traffic stop beyond "time reasonably required to complete [the stop's] mission." Rodriguez v. United States, 575 U.S. 348, 357 (2015) (quotation omitted).

BWC at 05:57-06:00; Dash Cam at 07:20-07:23.)  Freddy put his front paws on the rear passenger door and immediately retreated by placing his paws back on the ground. (Williamson BWC at 06:00-06:01.)  Deputy Williamson proceeded to the front passenger window and said "here, up, up, Freddy, up," while gesturing with his hand into the open window.  (Id. at 06:01-06:05.)  Freddy put his front paws on the door and his snout and face inside the open window, and again he retreated almost immediately by placing his paws on the ground.  (Id. at 06:05-06:07.)

Deputy Williamson led Freddy around the front of the Impala and said "here."  (Id. at 06:07-06:11.)  Near the passenger side headlight, Freddy paused and turned his head, but it is unclear whether he was sniffing the car or looking back at the onlookers.  (Id. at 06:07-06:13.) Deputy Williamson guided Freddy back to the open driver's window.  (Id. at 06:13-06:15; Dash Cam at 07:34-07:36.)  Deputy Williamson said "up" and again reached his hand and forearm inside the window.  (Williamson BWC at 06:15-06:16; Dash Cam at 07:36-07:38.) Freddy planted his front paws on the door, briefly stuck his snout inside the window, pulled his face out of the window and looked away from the Impala.  (Williamson BWC at 06:16-06:19; Dash Cam at 07:38-07:42.)  Deputy Williamson said to Freddy, "what is it?  Here, check it," and Freddy retreated by returning his front paws to the ground.  (Williamson BWC at 06:18-06:20; Dash Cam at 07:42-07:44.)  Freddy began walking away from the Impala, and Deputy Williamson pulled him back toward the Impala and told Freddy again to "check it." (Williamson BWC at 06:20-06:25; Dash Cam at 07:43-07:48.)  They walked the perimeter of the Impala from the driver's side, to the trunk, and then to the passenger side.  (Williamson BWC at 06:25-06:29; Dash Cam at 07:48-07:52.)

When they reached the rear passenger window for the second time, Deputy Williamson said "here, up, up, up, up, up," while reaching his hand inside the window and snapping his fingers each time he said "up." (Williamson BWC at 06:28-06:36; Dash Cam at 07:51-07:59.) Freddy put his paws on the door but did not put his snout in or near the window and immediately pushed his paws off the car to return to the ground. (Williamson BWC at 06:36-06:37; Dash Cam at 07:59-08:00.) In response, Deputy Williamson said, "good boy, good boy" and then "up" as he moved to the front passenger window. (Williamson BWC at 06:36-06:40.) Deputy Williamson gestured toward the window when he said "up," but Freddy ignored him and continued to walk toward the front of the Impala. (Id. at 06:38-06:42.)

As they walked toward the driver's window for a third time, Freddy began to walk away from the Impala, and Deputy Williamson pulled on the leash and said "up" to bring Freddy back to the window. (Williamson BWC at 06:42-06:48; Dash Cam at 08:07-08:09.) Freddy took a few steps in that direction but then pulled away again and walked away from the Impala. (Dash Cam at 08:09-08:13.) At this moment, Deputy Williamson said to Defendant, "well, I hate to break the news to you, but the dog's going in your car." (Williamson BWC at 06:50-06:53.) When Defendant protested inaudibly, Deputy Williamson responded, "because he showed interest on the other side" and directed Defendant, who had begun walking toward him, to stand back with Officer Bell. (Id. at 06:53-06:58; Dash Cam at 08:16-08:21.)

Deputy Williamson opened the driver's door and Freddy jumped inside. (Williamson BWC at 06:58-07:03; Dash Cam at 08:21-08:26.) Freddy sniffed the driver's seat and passenger seat, then returned to the driver's seat and faced Deputy Williamson. (Williamson BWC at 07:03-07:11; Dash Cam at 08:26-08:34.) Deputy Williamson gestured toward the backseat, but Freddy jumped out of the car through the driver's door. (Williamson BWC at

07:07-07:12; Dash Cam at 08:33-08:34.)  Deputy Williamson opened the rear driver's side door and Freddy jumped in the backseat.  (Williamson BWC at 07:12-07:16; Dash Cam at 08:34-08:39.)  Deputy Williamson said, "find it," and Freddy sniffed throughout the backseat, particularly near the passenger side floorboard.  (Williamson BWC at 07:12-07:20.)  Freddy looked up at Deputy Williamson and attempted to sit but could not fully do so because of a booster seat and other items on the backseat.  (Id. at 07:20-07:22.)  Sitting is Freddy's "final alert" when he has located narcotics, and the parties do not dispute Freddy was attempting to give his final alert.  (See Transcript, pp. 20, 31.)  Deputy Williamson said, "good boy!" and Freddy exited the Impala.  (Williamson BWC at 07:22-07:23; Dash Cam at 08:45-08:46.)

Deputy Williamson exclaimed to Defendant, "the car is mine now!" and returned Freddy to the patrol car.  (Williamson BWC at 07:23-07:33; Dash Cam at 08:46-08:51.)  As Deputy Williamson returned to the Impala, he said, "because my dog alerted to the backseat," and, when he saw Defendant walking toward the car, "don't step near the car."  (Williamson BWC at 07:39-07:42.)  Defendant protested while Officer Bell grabbed Defendant by the forearm and pulled him away from the Impala, and Deputy Williamson said, "step back."  (Id. at 07:42-07:49; Dash Cam at 09:06-09:11.)

Deputy Williamson opened the rear passenger-side door and picked up a gray backpack on the floorboard where Freddy gave his final alert.  (Williamson BWC at 07:49-07:57; Dash Cam at 09:12-09:19.)  Deputy Williamson pulled a plastic container out of the backpack and opened the lid to discover several plastic bags with drugs.  (Williamson BWC at 07:57-08:02.)  Defendant ran.  (Incident Report, pp. 22, 25; see also Williamson BWC at 08:01-08:04; Dash Cam at 09:23-09:27.)  Officers Bell and Guerra chased Defendant while Deputy Williamson

radioed, "got one running!" and joined the foot chase. (Incident Report, pp. 22, 25; Williamson BWC at 08:03-08:10; Dash Cam at 09:24-09:33.)

Officers Guerra and Bell grabbed Defendant and were attempting to subdue him. (Incident Report, pp. 22, 25; Williamson BWC at 08:08-08:11.) As Deputy Williamson approached the scuffle, he shouted, "taser, taser, taser!" and drew his taser. (Williamson BWC at 08:09-08:12.) Defendant managed to escape the officers' grasp and resumed running. (Id. at 08:11-08:13.) Deputy Williamson again yelled, "taser!" and fired, hitting Defendant with the taser prongs in the back. (Id. at 08:12-08:14.) Defendant fell to the ground, and Officers Guerra and Bell subdued him. (Id. at 08:12-08:18.) Deputy Williamson briefly released the taser trigger while telling Defendant to roll onto his stomach and put his hands behind his back, (Id. at 08:18-08:20), then tased Defendant again for five seconds while Officers Guerra and Bell began handcuffing Defendant, (Id. at 08:20-08:25).

Deputy Williamson said, "you didn't want us to find that dope in the backseat," to which Defendant responded "ain't no dope in the backseat" while resisting Officers Guerra and Bell's attempts to handcuff him. (Id. at 08:25-08:28.) Deputy Williamson twice said, "put your hands behind your back or you'll get it again," and Defendant responded both times with "ain't gonna do it." (Id. at 08:28-08:34.) Deputy Williamson tased Defendant a third time for five seconds while telling Defendant to "stay down" and "put your hands behind your back" while Officers Guerra and Bell were on top of Defendant. (Id. at 08:35-08:40.) Defendant continued to struggle against Officers Guerra and Bell's efforts to subdue him, and Deputy Williamson again told him to stop resisting or he would "get it again" and tased him a fourth time for three seconds. (Id. at 08:40-08:49.) Deputy Williamson radioed "10-10, Potter Place, 10-10" and tased Defendant again for two seconds. (Id. at 08:49-08:53.) Defendant continued

to struggle against the officers for several seconds and Deputy Williamson again warned Defendant he would "get it again," to which Officer Bell said, "give it to him again," and Deputy Williamson tased Defendant a sixth time, this time for nine seconds.  (Id. at 08:54-09:17.)  Officers Guerra and Bell finally handcuffed Defendant as another patrol car pulled into the parking lot.  (Id. at 09:18-09:46.)

        With Defendant subdued, Deputy Williamson donned gloves, removed the taser prongs from Defendant's back, and interacted briefly with Defendant, saying, "you're lucky I didn't turn the dog loose on you."  (Id. at 09:47-09:59; Doc. no. 316, Ex. 2, Clip 2, "Williamson BWC 2," at 00:00-00:56.)  Deputy Williamson returned to the Impala, picked up the plastic container, and told another officer on scene it contained "a whole bunch of dope," identifying the drugs as "ecstasy, cocaine, [and] marijuana."  (Williamson BWC 2 at 01:20-02:10.)  Deputy Williamson told another officer, "this vehicle's gettin' seized" and walked back over to Defendant, who was being patted down by Officers Guerra and Bell.  (Id. at 02:15-02:50.)  As he approached Defendant, he told other officers he passed, "you can seize that vehicle" and showed them the drugs.  (Id. at 02:30-02:40.)  Once he was within earshot of Defendant, he asked, "didn't do nothing, huh?"  (Id. at 02:41-02:44.)  When Defendant responded "no," Deputy Williamson said, "ecstasy, cocaine, marijuana . . . I told you, that car is mine, now." (Id. at 02:44-02:51.)  Defendant interjected and Deputy Williamson responded, "well, guess what, whose car is it?  Whose car was it?  It's mine now."  (Id. at 02:52-02:56.)  Defendant said, "it's my car," and Deputy Williamson again said, "it's mine now."  (Id. at 02:56-03:00.)

        Officers Bell and Guerra joined Deputy Williamson for a discussion.  (Id. at 03:24-03:35.)  Deputy Williamson explained he considered letting Freddy loose when Defendant began running but opted not to do so because Freddy might have chased the officers instead.

9

(Id. at 03:36-03:41.)  Deputy Williamson asked where the Impala would be impounded and noted it was subject to seizure based on the weight of drugs.  (Id. at 03:42-04:40.)  When another officer handed over a stack of cash confiscated from Defendant's pockets, Deputy Williamson put it with the drugs and said, "I love taking drug dealers' money."  (Id. at 04:36-04:45.)

After explaining to other officers he had sufficient evidence to seize the Impala but an insufficient quantity of drugs to support a trafficking charge, Deputy Williamson resumed his search of the backpack.  (Id. at 04:46-05:35.)  He pulled out a Folgers coffee container and yelled, "wait a minute" as he discovered additional drugs.  (Id. at 05:36-05:41.)  When he saw the quantity of drugs, he yelled, "oh, that's trafficking!", identifying the drugs by sight as methamphetamine and cocaine.  (Id. at 05:40-06:06.)  Deputy Williamson found a scale and additional drugs in the backpack.  (Id. at 06:22-06:50.)  Inside the Impala, Deputy Williamson discovered plastic baggies, ammunition, and a Glock.  (Id. at 07:24-10:00; Doc. no. 316, Ex. 2, Clip 2, "Williamson BWC 3," at 00:19-01:30.)

Taking a break, Deputy Williamson asked Officers Guerra and Bell, "how many times did I hit him with my taser?  Five before he finally gave up?"  (Williamson BWC 3 at 00:08-00:12.)  Officer Bell replied "it was a lot" and Officer Guerra nodded in agreement while saying something inaudible.  (Id. at 00:13-00:18.)  After finding the gun, Deputy Williamson detailed a summary of what he found and the anticipated charges to another officer.  (Id. at 02:25-02:43.)  Deputy Williamson informed the officer he tased Defendant "five times before he finally gave up."  (Id. at 02:50-03:04.)  Officer Guerra added she heard Deputy Williamson warning he was going to tase Defendant and tried to "roll out of the way."  (Id. at 03:05-03:08.)

Deputy Williamson responded "trust me, I'm a taser instructor, I ain't gonna shoot you. That takes the fun out of it when I don't do it on purpose." (Id. at 03:08-03:13.)

Deputy Williamson showed the officer the evidence he had discovered, they discussed custody of the evidence, and Deputy Williamson called to report the use of force to his supervisor, explaining he deployed the taser "five times to get [Defendant] to quit fighting." (Id. at 07:10-07:15.) On the phone with his supervisor and then a subsequent call with the Sheriff, Deputy Williamson repeatedly emphasized their department would receive a portion of the money seized. (Id. at 07:25-09:25.)

## 2. Deputy Williamson's Testimony

When testifying at the evidentiary hearing, Deputy Williamson explained Freddy is trained to first identify a scent cone then narrow the area to find the scent source. (Transcript, p. 14.) When Freddy pinpoints the scent location, he sits as a final alert. (Id. at 20; see also id. at 13-14, 17.) While Freddy is within the scent cone and searching for the scent location, he displays subtle indicators such as changes in breathing and moving his head back and forth. (See id. at 12-14, 17-18, 23.) Deputy Williamson did not testify these subtle indicators are trained behaviors. (See id. at 11-40.) Rather, Deputy Williamson interprets these untrained behavioral subtleties as indications Freddy has detected the scent and is searching for the exact location. (Id. at 17; see also id. at 13-14, 16-17, 22, 31.) Deputy Williamson offered no further explanation concerning these subtle indicators, leaving the Court with no information concerning whether Deputy Williamson learned to identify these indicators during formal training or discerned them himself from years of working with Freddy. Nor did he offer any information concerning reliability and accuracy of these indicators.

Deputy Williamson described his understanding of the law concerning "reaching in" a car window as follows:

> Q.    When you're handling a K-9 around a car, at what point are you allowed to open the car door?
> A.    Once I have probable cause to believe there's odor of a narcotic.
> Q.    Okay.  At what point are you allowed to reach through an open window?
> A.    Well, if the windows are open, all I do is actually present.  My hand might have went a little farther than that.  I didn't reach in intentionally.  It just – I'm presenting the window to the dog because it's open.
> Q.    Okay.  So at what point have you been trained – are you allowed to reach through an open window?
>         . . . .
> A.    We're not actually allowed to reach in.  We're allowed to present the open window.  Now, the dog naturally is going to stick his nose in there.  I'm just trying to present the – where I want him to sniff.

(Id. at 26-27.)  Deputy Williamson explained when he presents a location to sniff, "I use the back of my hand.  I don't tap on anything.  I just use the back of my hand."  (Id. at 31.)

Deputy Williamson testified Freddy "went up on his own" when they first approached the car and Freddy put his nose inside the driver's window, even though Freddy did so immediately after Deputy Williamson said "here . . . Freddy, up," while reaching his hand inside the window.  Deputy Williamson testified Freddy putting his nose inside the window on this first occasion was an "indication he's telling me he's smelling something."  (Id. at 17.)

Deputy Williamson testified Freddy's breathing changed when first walked to the rear of the vehicle, which he identified as being "downwind."  (Id. at 14.)  He explained "at the back corner of the trunk . . . Fredd[y]'s breathing got really heavy, and his head went back and forth, which is indicative of the odor coming out of the vehicle through the holes into the trunk."  (Id. at 17.)  The drug odor traveled from the car cabin and through the trunk because, he explained, a moderate wind was blowing from the front of the car toward the rear.  (Id. at 14-16, 18, 22.)  While watching his body-worn camera footage, Deputy Williamson pointed

out traffic on the highway and parking lot banners waving to demonstrate wind strength and direction. (See id. at 15-16.) However, as demonstrated by the same footage, the banners waved constantly in the opposite direction than Deputy Williamson testified and the highway traffic closest to the parking lot traveled opposite the direction the Impala faced, indicating the Impala's trunk was upwind rather than downwind. (Williamson BWC at 04:24-04:52)

While reviewing the footage, Deputy Williamson claimed "indicators" by Freddy as being breathing changes, head movements, momentary hesitations, and tail wagging. (Transcript, pp. 12-14, 17-18, 23.) When reviewing footage of the beginning of the free air sniff, Deputy Williamson said, "[y]ou can't really see [Freddy's] breathing, obviously, but his breathing got really heavy right there at the corner of the trunk, and he kept moving his head back and forth. And that was my initial indicator of probable cause right there." (Id. at 22; see Dash Cam at 06:17-06:52.) Then, when shown the footage of him directing Freddy to sniff inside the rear passenger window, he explained: "You see how he stopped? His tail's wagging, and his breathing is heavy, He's going back and forth again. At that point, I knew I had probable cause. That was my decision point right there, that – I was confident." (Transcript, pp. 23; see Dash Cam 06:52-07:02.)

With respect to Defendant's attempted flight, Deputy Williamson testified he administered one five-second tase, as follows:

Q.    [Officers Guerra and Bell's] hands were on [Defendant] when you got to him?
A.    Yes, sir.
Q.    And you tased [Defendant]?
A.    Yes, sir.
Q.    And you tased [Defendant] five times?
A.    No, sir.
Q.    You didn't tase him five times?
A.    It would have been a 5-second tase, a 5-second cycle on the Taser.

13

Q.    One 5-second tase?

A.    Yes, sir.

(Transcript, pp. 35-36.)  After watching footage of him tasing Defendant five times, Deputy

Williamson conceded "I guess I did tase him more than once."  (Id. at 39-40.)

### B.    March 2022 Home and Vehicle Search

On March 23, 2022, officers from the Georgia Bureau of Investigation ("GBI"), Vidalia

Police Department ("VPD"), Toombs County Sheriff's Office ("TCSO"), and the United

States Marshals Service ("USMS") executed an arrest warrant for Joshua Brown, Defendant's

son and a co-defendant in this case.  (Doc. no. 227-1, "GBI Summary," p. 1; see also doc. no.

3 (indicting Joshua Brown, Defendant, and others); Transcript, p. 53 (explaining "initial

mission" on March 23rd was arresting Joshua Brown).)  The warrant related to Joshua Brown's

alleged involvement in a drive-by shooting.  (GBI Summary, p. 1; Transcript, p. 71.)  Joshua

Brown and Defendant were known to reside at 616 Scott Drive in Vidalia, where USMS

officers conducted surveillance in preparation for the arrest on the morning of March 23, 2022.

(GBI Summary, p. 1.)  Prior to March 23, 2022, GBI agents had conducted several controlled

drug purchases at the same residence.  (Transcript, p. 58.)

USMS officers observed Defendant park a red Impala in front of the residence and go

inside, where he remained.  (GBI Summary, p. 1; Transcript, pp. 46, 57, 72-73.)  An unknown

male visited the residence briefly and left, which USMS Task Force Officer Benjamin Warren

testified was indicative of a drug purchase.  (Transcript, p. 58.)  No other individuals entered

or exited the residence while USMS continuously surveilled the residence throughout the

morning.  (See GBI Summary, p. 1; Transcript, pp. 46, 55, 57-58, 72-73.)  The team learned

during surveillance that Defendant had an active warrant for conspiracy to sell heroin and

obtained a warrant for the residence to locate Defendant and effectuate his arrest.  (GBI Summary, p. 1; doc. no. 315-2.)

Officers surrounded the residence and conducted a "callout," directing all individuals inside the residence to come outside.  (GBI Summary, p. 1; Transcript, p. 62.)  While conducting the callout, law enforcement remained behind their vehicles and bullet shields. (Transcript, pp. 62-63.)  A minor female exited the residence, followed by Defendant and then Joshua Brown.  (GBI Summary, p. 1; Transcript, pp. 46-47, 74.)  Officer Warren estimated five to ten minutes elapsed before the girl exited the residence.  (Transcript, p. 60.)  Law enforcement arrested Joshua Brown and Defendant.  (GBI Summary, p. 1; Transcript, p. 48.)

While the arrests occurred, USMS officers conducted a protective sweep inside the residence and observed in plain view several firearms and a large bag of marijuana.  (GBI Summary, p. 2.)  No additional individuals were located during the protective sweep.  (Id.) During his arrest, Defendant advised Agent Allen there were several firearms in Joshua Brown's bedroom.  (Id.)  Agent Allen was aware Defendant was a convicted felon.  (Id.; Transcript, pp. 66-67.)  Based on this information, Agent Bell obtained an additional warrant to search the residence and Defendant's Impala for firearms and illegal drugs.  (GBI Summary, p. 2; doc. no. 227-2.)  GBI officers searched the residence and Impala and seized firearms, ammunition, drugs, and drug paraphernalia.  (GBI Summary, pp. 2-10.)

Officer Warren testified the protective sweep was limited to a cursory inspection for occupants with no sweep of any area too small for a person.  (Transcript, p. 60.)  Officer Warren determines whether to conduct a sweep on a case-by-case basis based on his perception of the danger level.  (Id. at 47, 60.)  He decided to conduct a protective sweep of Defendant's home because (1) the minor female was a surprise and raised the specter of additional unknown

occupants; (2) the home "was a known drug spot"; (3) Joshua Brown's underlying offense was a drive-by shooting with two accomplices; and (4) five to ten minutes elapsed during the callout before the first person exited the home. (Id. at 47-48, 59-61.)

## II.    DISCUSSION

### A.    Evidence from the April 2021 Traffic Stop Should Be Suppressed

Defendant argues that, while officers were justified in conducting a Terry stop of Defendant for a seatbelt infraction, the free air sniff by Freddy and Deputy Williamson did not provide probable cause to conduct a warrantless search of the Impala's interior. (See doc. nos. 229, 347.) Police may conduct a warrantless search of a vehicle during a Terry stop when the search is incident to a lawful arrest, conducted with valid consent, or based on probable cause to believe the vehicle contains contraband or evidence of a crime and the vehicle is operational. Arizona v. Gant, 556 U.S. 332, 351 (2009) (incident to lawful arrest); Pennsylvania v. Labron, 518 U.S. 938, 940-41 (1996) (*per curiam*) (probable cause); Ohio v. Robinette, 519 U.S. 33, 39-40 (1996) (valid consent). As explained below, Freddy's free air sniff was tainted by constitutional violations and woefully inadequate to establish probable cause, and the exclusionary rule requires suppression.

### 1.    Deputy Williamson Violated the Fourth Amendment by Repeatedly Encouraging Freddy to Stick His Head Inside the Impala's Open Windows, and By Repeatedly Sticking His Own Hand Inside

As the Eleventh Circuit explained twelve years ago, a trained dog's encroachment of a vehicle's interior during a free air sniff does not violate the Fourth Amendment if the encroachment is instinctive rather than prompted by an officer's encouragement, facilitation, or misconduct. U.S. v. Mostowicz, 471 Fed. App'x 887, 890-91 (11th Cir. 2012) (*per curiam*)

(unpublished).[3]  No constitutional violation occurs when, for example, a dog jumps through an open car door or sticks his head through an open car window so long as the act is purely instinctive and unprompted.  Id.

Here, on four separate occasions, Freddy invaded the interior of the Impala by placing his snout inside the open car windows, and he never did so instinctively.  Instead, as detailed in the factual background, Deputy Williamson prompted the behavior each time by verbal commands and hand gestures that also broke the plane of the windows.  Each of Deputy Williamson's hand gestures violated the Fourth Amendment because "an officer's momentary reaching into the interior of a vehicle [] constitute[s] a search."  U.S. v. Jones, 565 U.S. 400, 410 (2012) (citing Class, 475 U.S. 106, 114-15 (1986)).  Each of Freddy's encroachments also

---

[3] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2.  Though unpublished, the Court applies Mostowicz because it is well-reasoned and persuasive.  At least four other circuits agree with Mostowicz:

> See United States v. Pierce, 622 F.3d 209, 213-14 (3rd Cir. 2010) (concluding that no Fourth Amendment violation occurred when a dog jumped instinctively through an open car door "without facilitation by his handler"); United States v. Vazquez, 555 F.3d 923, 930 (10th Cir. 2009) (stating that "we have upheld the legality of [a dog] sniff during a lawful detention when, as here, (1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry . . . used by the dog"); United States v. Lyons, 486 F.3d 367, 373 (8th Cir. 2007) (seeing no Fourth Amendment violation when a dog stuck his head instinctively through a van's open window without being directed to do so by officers); United States v. Reed, 141 F.3d 644, 650 (6th Cir. 1998) (stating that "absent police misconduct, the instinctive acts of trained canines . . . do[ ] not violate the Fourth Amendment"); United States v. Stone, 866 F.2d 359, 363-64 (10th Cir. 1989) (seeing no Fourth Amendment violation when a dog jumped instinctively into defendant's open hatchback and when the officers did not ask defendant to open the hatchback for purposes of the dog sniff); cf. United States v. Winningham, 140 F.3d 1328, 1330-31 (10th Cir. 1998) (concluding that a dog sniff of the inside of a van was unlawful when the officers opened the van's door and unleashed the dog as it neared the open door).

Mostowicz, 471 Fed. App'x at 890-91; see also United States v. Mason, 628 F.3d 123, 130 (4th Cir. 2010) (finding no Fourth Amendment violation where dog alerted before entering through car window and the handler had not prompted dog to do so).

violated the Fourth Amendment under a straightforward application of <u>Mostowicz</u> and the decisions cited therein by the Third, Sixth, Eighth, and Tenth Circuits.[4]

The government argues Freddy's behavior gave Deputy Williamson probable cause to search the Impala from the very outset of the free air sniff, such that Deputy Williamson always had the constitutional authority to place his hand inside the open windows. However, as explained *infra* Section II(A)(2), Freddy's behavior throughout the free air sniff never provided Deputy Williamson with probable cause.

The government contends Defendant waived the encroachment argument by not including it in the original motion and brief. (<u>See</u> doc. no. 349, p. 2; <u>see also</u> Transcript, p. 27 (objecting to questioning on this topic as outside scope of defense brief).) The Court rejects this contention for two reasons. First, defense counsel explained at the hearing that, at the time he filed the motion, the government had not yet produced Deputy Williamson's body camera footage, and this footage made clear to defense counsel the hand gestures that prompted Freddy. (Transcript, p. 91.) Second, the governed received adequate notice and an opportunity

---

[4] <u>See also</u> <u>United States v. Green</u>, No. 2:23-cr-101, 2024 WL 998820, at *6-7 (N.D. Ala. Feb. 12, 2024) (finding Fourth Amendment violation where officer opened door moments before sniff to encourage and facilitate canine's jump into truck); <u>United States v. Hernandez</u>, No. 1:20-CR-196-07, 2022 WL 2133877, at *8 (N.D. Ga. Jan. 28, 2022) (finding officer did not facilitate or encourage canine jumping into van because door left open unintentionally, although recognizing best practice is to shut door before canine sniff and decision was "close call"); <u>U.S. v. Corbett</u>, 718 F. Supp. 3d 537, 563 (S.D. W. Va. 2024) (finding dog snout intrusion into open windows constituted Fourth Amendment trespass because dog was trained to do so and act was not instinctive); <u>United States v. Hutchinson</u>, 471 F. Supp. 2d 497, 506 (M.D. Pa. 2007) (collecting cases holding that canine sniff which migrates to interior does not violate Fourth Amendment if canine makes entry into vehicle "of its own initiative and is neither encouraged into nor placed in the vehicle by a law enforcement officer"), *aff'd*, 316 F. App'x 137 (3d Cir. 2009); <u>cf.</u> <u>United States v. Newberry</u>, No. 24-CR-1026, 2024 WL 4590159, at *13 (N.D. Iowa Oct. 28, 2024) (finding dog breaking plane of window constitutes warrantless search even when instinctive, but denying motion to suppress because probable cause existed prior to dog's intrusion), *adopted in part by* 2024 WL 4892519 (N.D. Iowa Nov. 26, 2024); <u>United States v. Handley</u>, No. 23-CR-57, 2024 WL 1536750, at *9 (N.D. Iowa Apr. 9, 2024) (finding dog violated Fourth Amendment by instinctively breaking plane of open window, but declining to apply exclusionary rule absent police misconduct).

to be heard in opposition because Defendant raised the argument at the suppression hearing, and the Court allowed both parties to file post-hearing briefs.  Cf. United States v. Franklin, 323 F.3d 1298, 1300 n.3 (11th Cir. 2003) (finding argument waived on appeal where not mentioned in motion, brief, or oral argument at suppression hearing); United States v. Thompson, 710 F.2d 1500, 1504 (11th Cir. 1983) (finding issue waived where government "fail[ed] to raise and develop the issue at the suppression hearing").  Accordingly, the Court finds good cause to excuse any untimeliness under Federal Rule of Criminal Procedure 12(c)(3) and exercises its discretion to rule on the merits.

> **2.    Freddy's Behavior Did Not Establish Probable Cause for Deputy Williamson to Open the Rear Passenger Door and Search the Interior of Defendant's Impala**

A free air sniff by a trained drug detection dog and handler establishes probable cause to search a vehicle when "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."  Florida v. Harris, 568 U.S. 237, 248 (2013); see also United States v. Braddy, 11 F.4th 1298, 1312 (11th Cir. 2021); United States v. Trejo, 551 F. App'x 565, 568 (11th Cir. 2014) (per curiam).  Whether a dog actually finds illegal drugs inside a vehicle is irrelevant to the probable cause analysis because, as the Supreme Court explained in Harris, "we do not evaluate probable cause in hindsight, based on what a search does or does not turn up."  Harris, 568 U.S. at 249.  "[T]he burden of proof as to the reasonableness of the search rests with the prosecution."  United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983).

"Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," subject of course to a defendant's presentation

of evidence concerning inadequacies of training or poor performance in training by the dog or handler.  Harris, 568 U.S. at 246-47.  "Additionally, 'circumstances surrounding a particular alert may undermine the case for probable cause,' e.g., if the officer, consciously or not, cued the dog or if the team was working under unfamiliar conditions." Braddy, 11 F.4th at 1312 (quoting Harris, 568 U.S. at 247).  Because probable cause is a fluid concept, the Eleventh Circuit has rejected the notion that a dog must perform a final alert.  Id. at 1314.  It is "the province of the district court to observe and assess the officers' testimonies on their drug detection dogs' behaviors and to determine whether to credit their testimonies."  Id.

Turning first to the issue of qualifications, the government failed to present any evidence that "a bona fide organization has certified" Deputy Williamson and Freddy.  Harris, 568 U.S. at 247.  Nor is there evidence, as exemplified in Trejo, that Freddy has "successfully completed drug-detection courses each year for the three years leading up to the search . . . and maintained his proficiency through weekly training courses." Trejo, 551 F. App'x at 568. Also missing from the record is the most basic information concerning Freddy's initial training and certification, how often Freddy undergoes additional training by bona fide organizations, and whether Freddy and Deputy Williamson undertake regular training exercises to maintain Freddy's proficiency.  In fact, the only information presented to the Court on this topic is Deputy Williamson's generalized testimony that he and Freddy are trained "in narcotics search, evidence search, apprehension, and tracking" and have worked together for five years. (Transcript, pp. 11-12, 17, 25-26.)  In short, the government has failed to establish Freddy's bona fides.

In addition, there is a complete absence of probable cause in the behavior Freddy displayed before Deputy Williamson told Defendant "well, I hate to break the news to you, but

the dog's going in your car . . . . because he showed interest on the other side." (Williamson BWC at 06:50-06:58.) Indeed, as detailed *supra* Section I(A)(1), it is obvious from the footage that Freddy's behavior repeatedly established his complete lack of any interest in the Impala. Time and again, Freddy pulled away from the Impala and only paid attention when Deputy Williamson made him do so by verbal commands, pulling on the leash, tapping the Impala, and placing his hand inside the open windows.

By Deputy Williamson's own admission, Freddy never provided a final alert while outside the Impala. Deputy Williamson testified Freddy's untrained, subtle behavioral "indicators" established probable cause based on changes in breathing, head movements, a moment of hesitation, and tail wagging. But the Court is skeptical because Deputy Williamson provides no context or explanation concerning how he or others determined these subtle behaviors establish Freddy has found a scent. Moreover, the footage contains many examples of head movements, moments of hesitation, and tail wagging when Freddy was not sniffing around the Impala and was entirely focused on other things, such as the onlookers.

Furthermore, the Court finds Deputy Williamson's testimony to not be credible for at least three reasons. First, the camera footage directly contradicts Deputy Williamson's testimony. Deputy Williamson testified the wind blew from the front of the Impala to the rear. Wind direction was critical to Deputy Williamson's testimony because he pinpointed Freddy's subtle behavioral changes at the trunk of the Impala as establishing probable cause and explained Freddy was able to smell the drugs in this location because the wind pushed the scent cone downwind from the cabin to the trunk. (Transcript, pp. 14-16, 18-19, 22-23.) However, footage of the parking lot banners irrefutably shows the wind blowing consistently in the opposite direction, i.e. from the rear of the Impala to the front. (Williamson BWC at

04:24-04:52.)  Deputy Williamson himself pointed out the banners waving in the wind and yet continued to testify the wind, and thus the scent cone, moved in the opposite direction of what the banners clearly showed.  (See Transcript, pp. 15-16, 18-19, 22-23.)

Second, Deputy Williamson's testimony is replete with misrepresentations of Freddy's behavior and exaggerations of Freddy's interest in the Impala.  For example, while referring to Freddy's first visit to the driver's door, he testified, "Fredd[y] *went up on his own* on that window."  (Id. at 17 (emphasis added).)  But footage shows Freddy pulling away and only putting his paws on the window *after* Deputy Williamson said, "here . . . Freddy, up," while reaching inside the window.  (Williamson BWC at 05:02-05:05; Dash Cam at 06:26-06:28.)  Deputy Williamson further testified, "[r]ight there at the back corner of the trunk . . . Fredd[y]'s breathing got really heavy, and his head went back and forth, which is indicative of the odor coming out of the vehicle through the holes into the trunk."  (Transcript, p. 17.)  The footage does not show any objective change in Freddy's breathing or any telling head movements.  On the contrary, Freddy sniffed the trunk seam only at Deputy Williamson's instruction and repeatedly pulled away from the Impala while Deputy Williamson attempted—often unsuccessfully—to redirect Freddy's attention to the Impala.  (See Williamson BWC at 05:10-05:27; see also Dash Cam at 06:32-06:50.)

Moreover, after Freddy sniffed the trunk seam and moved to the passenger side, he pulled away again, seemingly distracted by nearby onlookers, and Deputy Williamson had to repeatedly yank on Freddy's leash to redirect his attention back to the Impala.  (Williamson BWC at 05:24-05:33; Dash Cam at 06:47-06:56.)  These are not the only inconsistencies between Deputy Williamson's description of Freddy's behavior and Freddy's actual behavior.  (Compare, e.g., Transcript, p. 31 (explaining, when presenting a location to Freddy, "I use the

back of my hand.  I don't tap on anything.  I just use the back of my hand."), with Williamson BWC at 05:33-05:34, 05:39-05:45 (showing Deputy Williamson tapping on the inside of the partially rolled-down rear passenger window to present the open window to Freddy).)

Finally, while not directly relevant to the free air sniff, Deputy Williamson's initial testimony concerning the tasing of Defendant was obviously incorrect.  Footage clearly shows Deputy Williamson tasing Defendant five times and boasting about it on three occasions to officers on scene.  (See Williamson BWC 3 at 00:08-00:18, 02:50-03:04, 07:10-07:15; see also id. at 08:03-08:07 (telling supervisor via phone he would file a use of force report).)  Yet, Deputy Williamson adamantly testified he administered one five-second tase to Defendant despite defense counsel's repeated questioning.  (See Transcript, pp. 35-36.)  Deputy Williamson corrected his testimony only after watching footage of him tasing Defendant five times.  (Id. at 39-40 ("I guess I did tase him more than once.").)

For these reasons, the Court rejects Deputy Williamson's characterization of Freddy's subtle behavioral indicators as unreliable and finds the camera footage itself a far more reliable source.  See United States v. Boyce, 351 F.3d 1102, 1108 (11th Cir. 2003) (finding district court erred when crediting officer's testimony where "videotape belies [the officer]'s testimony").[5]  Furthermore, after carefully considering all the facts surrounding Freddy's free

---

[5] The Court would be remiss not to at least mention Deputy Williamson's attitude and demeanor throughout the traffic stop.  He took every opportunity to antagonize Defendant even after handcuffing.  (See, e.g., Williamson BWC 2 at 02:41-02:44 (asking Defendant, "didn't do nothing, huh?" while presenting container of drugs he discovered); id. at 02:44-03:00 (repeatedly and emphatically telling Defendant the Impala "is mine, now").)  He bragged to officers about tasing Defendant five times and described it as fun.  (Williamson BWC 3 at 00:08-00:12, 2:50-3:13, 07:10-07:15.)  He spoke of the drug and asset seizure as if he and his department hit winning numbers in a lottery.  (Williamson BWC 2 at 04:36-04:45 ("I love taking drug dealers' money."); id. at 02:15-03:00, 03:42-04:40, 05:40-05:43; Williamson BWC 3 at 07:25-09:25 (repeatedly emphasizing his department would receive a portion of the money seized).)

air sniff through the lens of common sense, the Court finds a reasonably prudent person would not "think that a search would reveal contraband or evidence of a crime." Harris, 568 U.S. at 248. Accordingly, the warrantless search of the Impala's interior was unreasonable and violative of the Fourth Amendment.[6]

### 3.    The Exclusionary Rule Requires Suppression

The judicially created remedy known as the exclusionary rule acts as a deterrent to Fourth Amendment violations by prohibiting admission of the resulting evidence. United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). However, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." Herring v. United States, 555 U.S. 135, 140 (2009) (citing Illinois v. Gates, 462 U.S. 213, 223 (1983)). "Indeed, exclusion 'has always been our last resort, not our first impulse.'" Id. (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)). To warrant exclusion, "the benefits of deterrence must outweigh the costs," and the principal cost is "letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system." Id. at 141 (citations and internal quotations marks omitted). "Police practices

---

[6] See, e.g., Braddy, 11 F.4th at 1316 (Rosenbaum, J., concurring in part, dissenting in part) ("[P]lacing our blind faith in the officers' subjective interpretations of common dog behavior—especially when the same behavior occurs routinely in dogs who are not drug-sniffing canines—would effectively insulate law enforcement from judicial scrutiny."); Smith v. Sohn, No. 23-13566, 2024 WL 3688335, at *3 (11th Cir. Aug. 7, 2024) (per curiam) (unpublished) (expressing "skeptic[ism] that the officers had probable cause to search" car where K-9 never alerted and "although [the handler] states that subtle changes in the dog's behavior suggested an alert, the video does not reflect those changes"); United States v. Rivas, 157 F.3d 364, 368 (5th Cir. 1998) (concluding "weak" indicators by canine during free air sniff, including "temporarily stopping, giving part of the [vehicle] 'minute attention' and continuing with the inspection" was "too distantly related to an alert to create reasonable suspicion"); United States v. Wilson, 995 F. Supp. 2d 455, 475 (W.D.N.C. 2014) ("To allow a search predicated upon an officer's interpretation of the utterly minimalist [indicators] exhibited by the dog in this case would be tantamount to permitting law enforcement officers to issue their own search warrants based upon their own subjective analysis, something the Framers explicitly prohibited."); cf. United States v. Guidry, 817 F.3d 997, 1006 (7th Cir. 2016) (finding "officers had probable cause to search the interior because [K-9] Bud indicated that the car contained drugs while sniffing the car's perimeter" where the K-9 sat (his final alert) by the car door during the perimeter sniff).

trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" Davis v. United States, 564 U.S. 229, 240 (2011) (quoting Herring, 555 U.S. at 144). The government makes no arguments regarding whether the exclusionary rule applies.

Here, Deputy Williamson's conduct is sufficiently deliberate and culpable to warrant exclusion. "Responsible law enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules." Davis, 564 U.S. at 241 (quoting Hudson, 547 U.S. at 599). While a dog's final alert is not required for probable cause, Deputy Williamson blatantly disregarded Freddy's complete disinterest in the Impala when incorrectly determining he had probable cause to conduct the search. At every turn, Deputy Williamson prompted Freddy's actions, and he discerned probable cause from normal dog behavior that suggested nothing of the sort. Furthermore, Deputy Williamson knew he was "not actually allowed to reach in" to a car's open window yet repeatedly did so anyway. (Transcript, pp. 26-27.)

"As such, applying the exclusionary rule will afford meaningful deterrence in the form of updated training and practices concerning the need to avoid physical intrusions into the interior of a vehicle during a canine sniff." United States v. Buescher, 691 F. Supp. 3d 924, 940 (N.D. Iowa 2023), appeal dismissed on appellant's motion, No. 23-3265, 2023 WL 11015600 (8th Cir. Dec. 13, 2023). Accordingly, while exclusion is a remedy to be applied sparingly, the Court has no choice but to apply it here: "Under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment . . . cannot be used in a criminal trial against the victim of the illegal search and seizure." United States v. Perkins,

348 F.3d 965, 969 (11th Cir. 2003). Thus, the evidence obtained during the search of the Impala on April 30, 2021, must be excluded.

**B.** **Evidence From the March 2022 Search of Defendant's Home and Vehicle Should Not Be Suppressed**

**1.** **The Protective Sweep of Defendant's Home Was Justified and Reasonable**

Officers executing a valid arrest may conduct a warrantless, protective sweep of a home without running afoul of the Fourth Amendment. United States v. Yarbrough, 961 F.3d 1157, 1163 (11th Cir. 2020) (quoting United States v. Yeary, 740 F.3d 569, 579 (11th Cir. 2014)). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327 (1990). A protective sweep "may extend only to a cursory inspection of those spaces where a person may be found" and "last[] no longer than is necessary to dispel the reasonable suspicion of danger." Id. at 335-36. "To justify a protective sweep beyond the immediate location of the arrest, officers must have reasonable suspicion 'that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" Yarbrough, 961 F.3d at 1163 (quoting Buie, 494 U.S. at 334).

Because Defendant does not challenge the arrest warrants or the scope and duration of the protective sweep, the sole concern is whether specific and articulable facts "known to the officers gave rise to a reasonable suspicion that a dangerous individual was located inside the house." Yarbrough, 961 F.3d at 1163. Reasonable suspicion requires an analysis of "the totality of the circumstances–the whole picture" surrounding the arrest and protective sweep. Id. (quoting United States v. Sokolow, 490 U.S. 1, 8 (1989)). The Eleventh Circuit has approved protective sweeps, for example, when officers arrested a defendant while multiple

men and vehicles were present in his driveway, Yarbrough, 961 F.3d at 1163-65, and when officers detected during an arrest "noise indicating drug distribution activities might be occurring on the property," United States v. Williams, 871 F.3d 1197, 1202 (11th Cir. 2017).

Officer Warren testified he decided a protective sweep was necessary because (1) the minor female exited the home first, which was a surprise and raised the specter of additional unknown occupants; (2) the home "was a known drug spot"; (3) Joshua Brown's underlying offense involved a drive-by shooting with two accomplices; and (4) five to ten minutes elapsed during the callout before the first person exited the home. (Transcript, pp. 47-48, 59-61.) These reasons are compelling, based on undisputed facts, and more than sufficient to establish reasonable suspicion that a dangerous individual was located inside the house. Yarbrough, 961 F.3d at 1164 ("It is uncontroversial that drug activity can cause a rational officer to fear that (a) multiple people are involved, and (b) weapons to protect the drugs may be present.").

Defendant argues there was no reasonable suspicion because USMS officers surveilled the residence all morning and had not obtained any information to suggest there were additional occupants. (Doc. no. 348, p. 3.) But surveillance efforts had not affirmatively revealed the presence of Joshua Brown or the juvenile female either, and the officers had ample reason to believe Joshua Brown was armed and dangerous, his accomplices were also armed and dangerous, and the residence was an active drug distribution center.

Defendant further argues the sweep was unreasonable because it put the officers in greater danger than retreating from the location of the arrests, fifty yards from the residence. (Id. at 3-7.) This argument is unavailing for three common-sense reasons. First, reasonable actions by law enforcement are often dangerous; it is an expectation of the job to walk toward danger in many circumstances, not away from it. Second, Defendant's hindsight argument

fails to consider that fifty yards is not a safe distance from an armed assailant for a surveillance team to load up and leave the scene.  See Buie, 494 U.S. at 333 (explaining "being on his adversary's 'turf'" puts officer at disadvantage such that ambush is more reasonably feared). Third, requiring immediate retreat rather than a protective sweep constitutes an undue restriction of the discretion officers must retain to determine the safest exit strategy.

For these reasons, the Court finds "the facts known to the officers gave rise to a reasonable suspicion that a dangerous individual was located inside the house," justifying the protective sweep under the Fourth Amendment.  Yarbrough, 961 F.3d at 1163.  In making these findings, the Court finds entirely credible the testimony of Officer Warren and GBI Agents Bell and Allen.  (Transcript, pp. 45-75.)  Their testimony supplemented the written GBI Case Summary describing the events of March 22, 2023, and informed the facts as outlined *supra* Section I(B).  Each of them has significant law enforcement experience, were personally involved in the arrests, and provided testimony consistent with the written reports.

### 2.   Probable Cause Supported Issuance of the Search Warrant for the Residence and Impala

Defendant contends that "[a]lthough a Georgia magistrate judge issued a warrant for the search of the residence and the vehicle, the warrant was based on an affidavit that advanced only two theories—both 'so lacking in indicia of probable cause as to render official belief in the existence of probable cause entirely unreasonable.'" (Id. at 5 (quoting United States v. Leon, 468 U.S. 897, 923 (1984)).)  The government maintains that, even disregarding reference to any drugs or firearms observed during the protective sweep, the search warrant affidavit is sufficient to establish probable cause.  (Doc. no. 263, pp. 7-9.)  The government also maintains the Leon good-faith exception applies.  (Id. at 9.)  The Court agrees with the government.

### a.    Standard for Evaluating Probable Cause

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Thus, a search warrant must:  (1) be based on probable cause; (2) be supported by a sworn affidavit; (3) particularly describe the place to be searched; and (4) particularly describe the items to be seized.  See id.; United States v. Carson, 520 F. App'x 874, 888 (11th Cir. 2013).

In deciding whether to sign a search warrant, the issuing judge must make a "practical, common sense decision" whether, given all the information in the supporting affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Gates, 462 U.S. at 238).  "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 462 U.S. at 232).  The validity of the warrant is evaluated based on the totality of the circumstances.  See id.; see also United States v. Flowers, 531 F. App'x 975, 981 (11th Cir. 2013) (per curiam) ("Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location.").

The supporting affidavit "should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." United States v. Mitchell, 503 F. App'x 751, 754 (11th Cir. 2013) (per curiam) (unpublished) (citing

Martin, 297 F.3d at 1314).  Regarding the requisite nexus between the items sought and the

residence, "the affidavit must supply the authorizing magistrate with a reasonable basis for

concluding that Defendant might keep evidence of his crimes at his home, i.e., a 'safe yet

accessible place.'"  United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting

United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999)).

> The justification for allowing a search of a person's residence when that person
> is suspected of criminal activity is the common-sense realization that one tends
> to conceal fruits and instrumentalities of a crime in a place to which easy access
> may be had and in which privacy is nevertheless maintained.  In normal
> situations, few places are more convenient than one's residence for use in
> planning and hiding fruits of a crime.

Id. (quoting United States v. Green, 634 F.2d 222, 226 (5th Cir. 1981) [7]); see also United States

v. Anton, 546 F.3d 1355, 1358 (11th Cir. 2008) (holding evidence of defendant possessing

contraband of type normally expected to be hidden in residence will support search).

In the Eleventh Circuit, a court reviewing the decision of a judicial officer concerning

the existence of probable cause gives "great deference" to that determination.  United States

v. Bradley, 644 F.3d 1213, 1263 (11th Cir. 2011) (citing Brundidge, 170 F.3d at 1352).  Thus,

"the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis

for . . . conclud[ing]' that probable cause existed."  Cauchon v. United States, 824 F.2d 908,

911-12 (11th Cir. 1987) (citing Gates, 462 U.S. at 238-39).  Moreover, when some information

contained in an affidavit is later found to have been obtained in violation of the Fourth

Amendment, "if sufficient untainted evidence was present in the affidavit to establish probable

cause, the warrant was valid."  United States v. Whaley, 779 F.2d 585, 589 (11th Cir. 1986)

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh
Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October
1, 1981.

(citing United States v. Karo, 468 U.S. 705, 719 (1984)); see also United States v. Free, 254 F. App'x 765, 768 (11th Cir. 2007) (*per curiam*) (unpublished).

### b.    Agent Bell's Affidavit and Application for a Search Warrant Established Probable Cause

Upon examination of the totality of the circumstances, the Court concludes the Affidavit and Application for a Search Warrant provided a substantial basis for the Magistrate Judge's finding that "there [wa]s a fair probability of finding contraband or evidence at a particular location." Flowers, 531 F. App'x at 981. Indeed, the affidavit recounted Defendant's status as a felon, his admission of there being firearms inside Joshua Brown's room inside the home, and the officers' observations during the protective sweep of multiple firearms and a large bag of suspected marijuana in plain view. Even when one excludes from consideration all information gleaned from the protective sweep, the search warrant affidavit is still sufficient to establish probable cause based on Defendant's admission of the firearms and his status as a convicted felon. Whaley, 779 F.2d at 589. The affidavit recounts this information and seeks a search of the residence and Impala located on the property "for further evidence in the commission of the crime of . . . possession of firearm by convicted felon" in violation of Georgia law, specifically O.C.G.A. § 16-11-131. (Doc. no. 227-2, p. 2.)

Agent Bell confirmed he would have sought the search warrant absent the protective sweep, based solely on Defendant's admission about the firearms located in the residence. (Doc. no. 349, p. 4; Transcript, p. 72.) The Court finds this credible testimony is sufficient to demonstrate Officer Bell would have sought the warrant absent the protective sweep. United States v. Noriega, 676 F.3d 1252, 1260-61 (11th Cir. 2012) ("To determine whether an officer's decision to seek a warrant is prompted by what he saw during the initial entry, courts

ask whether the officer would have sought the warrant even if he had not entered." (citing Murray v. United States, 487 U.S. 533, 542 n.3 (1988))). Accordingly, "his decision to seek the search warrant is supported by an 'independent source,' and the evidence seized under the warrant is admissible regardless of whether the initial entry violated the Fourth Amendment." Id. at 1261 (citing United States v. Chaves, 169 F.3d 687, 692-93 (11th Cir. 1999)).

Defendant argues his "admission that multiple guns were 'inside the residence in his son's room' could not have created any belief that evidence of a crime would be present in the residence because Joshua was not a felon." (Doc. no. 227, p. 4.) As the supporting affidavit states, however, Defendant is a felon and the house was his known residence. Accordingly, the mere location of the firearms in a bedroom used by his son is not dispositive. As recently stated by the Georgia Court of Appeals in a case construing O.C.G.A. § 16-11-131:

> The law recognizes that possession can be actual or constructive, sole or joint. A person has actual possession of a thing if [she] knowingly has direct physical control of it at a given time. A person who, though not in actual possession, knowingly has both the power and intention at a given time to exercise dominion or control over a thing is then in constructive possession of it. If one person alone has actual or constructive possession of a thing, possession is sole, but if two or more persons share actual or constructive possession of a thing, possession is joint.

McAnnally v. State, 370 Ga. App. 340, 342, 897 S.E.2d 497, 502 (2024) (quoting Maddox v. State, 322 Ga. App. 811, 812, 746 S.E.2d 280 (2013)); see also Lebis v. State, 302 Ga. 750, 755, 808 S.E.2d 724, 730 (2017) (identifying that cohabitant's "belongings were intermixed in the room" as factor supporting constructive possession).

Defendant also argues the search of the Impala, located at the time on the residential property, lacked probable cause because "the affidavit supporting the warrant provided no theory for why evidence of criminal activity would be found there." (Doc. no. 227, p. 5.)

However, the affidavit explained that, during surveillance, Defendant "was observed exiting a red in color Chevrolet Impala . . . and entering the residence." (Id.) "[C]ommon sense dictates that . . . felons in possession of firearms often store them in [their vehicles and homes]." United States v. Morris, No. CR 117-039, 2017 WL 5180970, at *4 (S.D. Ga. Oct. 19, 2017), *adopted by* 2017 WL 5180436 (S.D. Ga. Nov. 8, 2017).

Accordingly, the magistrate judge had "a 'substantial basis for . . . conclud[ing]' that probable cause existed" to support the search of Defendant's Impala. Cauchon, 824 F.2d at 911-12 (citing Gates, 462 U.S. at 238-39); see also Morris, 2017 WL 5180970, at *4 ("Judge Thigpen had a substantial basis for concluding Defendant likely stored firearms and evidence of alligator hunting within his residence and vehicles, a 'safe yet accessible place' for those items." (citing Kapordelis, 569 F.3d at 1310-11)). Moreover, the warrant would have been valid even if the affidavit never mentioned the Impala because a warrant establishing probable cause to search a home may also authorize the search of vehicles parked on the property without any further explanation. See Mitchell, 503 F. App'x at 755 (explaining warrant authorizing search of home may also authorize search of parked vehicles even if "search warrant had been silent as to the vehicles." (citations omitted)).

> c.    **Even if the Search Violated the Fourth Amendment, the Good Faith Exception to the Exclusionary Rule Applies**

As described *supra* Section II(A)(3), the sparingly-applied exclusionary rule deters Fourth Amendment violations by prohibiting admission of the resulting evidence. Martin, 297 F.3d at 1312; Herring, 555 U.S. at 140-41. The good-faith inquiry, which provides an exception to the exclusionary rule, is objective and asks "'whether a reasonably trained officer would have known that the search was illegal' in light of 'all the circumstances.'" Herring,

555 U.S. at 145 (quoting <u>Leon</u>, 468 U.S. at 922 n.23). The focus of the inquiry is the culpability and mindset of a reasonable officer because "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." <u>Leon</u>, 468 U.S. at 916. Moreover, the government bears the burden of demonstrating the good faith exception applies. <u>United States v. Morales</u>, 987 F.3d 966, 974 (11th Cir. 2021); <u>United States v. Robinson</u>, 336 F.3d 1293, 1296-97 (11th Cir. 2003).

The basic insight of the <u>Leon</u> line of cases is the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. <u>Herring</u>, 555 U.S. at 143. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. <u>Id.</u> at 144. The exclusionary rule thus applies to police conduct that is deliberate, reckless, or grossly negligent but not to isolated incidents of negligence. <u>United States v. Brooks</u>, 648 F. App'x 791, 794 (11th Cir. 2016) (*per curiam*) (quoting <u>Herring</u>, 555 U.S. at 144). When police act with an objectively reasonable good-faith belief that their conduct was lawful, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way." <u>Leon</u>, 486 U.S. at 919 (quoting <u>United States v. Peltier</u>, 422 U.S. 531, 539 (1975)).

Under <u>Leon</u>, there are four scenarios under which the good faith exception to the exclusionary rule would not apply. The exception does not apply where the judge issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. <u>Leon</u>, 468 U.S. at 923. Nor does the exception apply in cases where the issuing judge "wholly abandoned" his or her detached and neutral judicial role such that no reasonably well-trained officer would rely on

the warrant.  Id.  The warrant must not be based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and the warrant must not be so "facially deficient" that the executing officers could not reasonably presume it was valid.  Id.

Here, the only exception identified by Defendant is the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  (Doc. no. 227, p. 5.)  However, as explained above, the Court has rejected the contention the affidavit was lacking in probable cause even when one omits from consideration all information obtained during the protective sweep.  The officers reasonably believed the protective sweep was lawful under the Fourth Amendment.  The search warrant affidavit demonstrated probable cause.  The magistrate judge properly issued the warrant.  Therefore, the officers' reliance on the search warrant was objectively reasonable.  For all these reasons, the Leon good faith exception applies.

## III.    CONCLUSION

The Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress fruits of the April 2021 vehicle search be **GRANTED**, (doc. no. 229), and Defendant's motion to suppress fruits of the March 2022 search of Defendant's home and vehicle be **DENIED**, (doc. no. 227).

SO REPORTED and RECOMMENDED this 3rd day of January, 2025, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA